**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pedro M. Sauzameda,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>　　　　　Defendant. | No. CV-22-01739-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Plaintiff Pedro M. Sauzameda's appeal from the Social Security Commissioner's denial of Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and Supplemental Security Income ("SSI") disability insurance benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1385. (Doc. 1). The appeal is fully briefed. (Docs. 14; 16; 17). The Court now rules.

## I.    BACKGROUND

The issues presented in this appeal are whether the ALJ erred by: (1) partly discrediting Plaintiff's testimony regarding the severity of his symptoms; and (2) finding that Plaintiff could perform work at the medium exertional level, with some limitations. (Doc. 14 at 1, 20).

### A. Factual Overview

Plaintiff filed an application for SSDI and SSI benefits in August 2018, alleging disabilities beginning on May 4, 2018, which included degenerative disc disease, diabetes,

and fibromyalgia. (Docs. 12–4 at 25; 14 at 1). At the onset date of disability, Plaintiff was 57 years old. (Doc. 14 at 23). He has a "limited (less than high school) education" and has past relevant work experience as an industrial cleaner. (*Id.* at 2).

Plaintiff's application was denied at the initial stage, upon reconsideration, and by an administrative law judge ("ALJ") on August 2, 2021. (Docs. 12–3 at 35; 12–4 at 38, 104). The Social Security Administration ("SSA") Appeals Council denied Plaintiff's request for review of the ALJ's decision and adopted that decision as the agency's final decision. (Doc. 12–3 at 2). Plaintiff then timely filed this action seeking review of the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3). (Doc. 1 at 1).

**B. The SSA's Five-Step Disability Determination Process**

To qualify for SSDI benefits, a claimant must show that he is "under a disability." 42 U.S.C. § 423(a)(1)(E). To be eligible for SSI benefits, a claimant's income and resources must not exceed a specified amount, and he must be an "aged, blind, or disabled individual." *See* 42 U.S.C. § 1382(a). To be either "disabled" or "under a disability," the claimant must be unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1); *see also id.* § 1382c(a)(3)(A), (C).

The SSA has created a five-step sequential evaluation process for determining whether an individual meets the SSDI and SSI disability requirement.[1] *See* 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). The steps are followed in order, and each is potentially dispositive. *See id.* § 404.1520(a)(4).

At the first step, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.*

---

[1] Because the five-step test to determine disability is effectively the same for both SSDI and SSI matters, the Court cites only to the SSDI process, to avoid unwieldy citations to essentially identical evaluations. *Compare* 20 C.F.R. § 404.1520(a)(4)(i)-(v), *with id.* § 416.920(a)(4)(i)-(v).

At the second step, the ALJ considers the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have "a severe medically determinable physical or mental impairment," the claimant is not disabled. *Id.*

At the third step, the ALJ determines whether the claimant's impairment or combination of impairments "meets or equals" an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. *Id.* If not, before proceeding to step four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"). *Id.* § 404.1520(a)(4). The RFC represents the most a claimant "can still do despite [his] limitations." *Id.* § 404.1545(a)(1). In assessing the claimant's RFC, the ALJ considers the claimant's "impairment(s) and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.*

At the fourth step, the ALJ uses the RFC to determine whether the claimant can still perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ compares the claimant's RFC with the physical and mental demands of the claimant's past relevant work. *Id.* § 404.1520(f). If the claimant can still perform his past relevant work, the ALJ will find that the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv).

At the fifth and final step, the ALJ determines whether—considering the claimant's RFC, age, education, and work experience—the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ finds that the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* If the ALJ finds that the claimant cannot make an adjustment to other work, then the claimant is disabled. *Id.*

**C. The ALJ's Findings**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (Doc. 12–3 at 23).

At step two, the ALJ found that Plaintiff's impairments—degenerative disc disease of the spine, bursitis of the left hip, and diabetes mellitus with neuropathy and fibromyalgia—were severe in combination under 20 C.F.R. §§ 404.1520(c) and

416.920(c). (Doc. 12–3 at 23–24). The ALJ also determined that the rest of Plaintiff's alleged impairments were non-severe. (*Id.*).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 12–3 at 24–26). The ALJ then ascertained that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), with some exceptions. (*Id.* at 26–33). The ALJ noted that, despite Plaintiff's degenerative disc disease, he could "occasionally lift, carry, push and pull 50 pounds" and could "frequently lift, carry, push and pull 25 pounds." (*Id.* at 26). In addition, the ALJ determined that Plaintiff was able to sit, stand, and walk for 6 hours in an 8-hour workday and could "frequently reach in all directions, including overhead, with his arms bilaterally." (*Id.*). The ALJ addressed Plaintiff's carpal tunnel symptoms as nonsevere, allowing Plaintiff to "frequently handle and finger with his right hand." (*Id.* at 26, 30). The ALJ accounted for Plaintiff's history of fibromyalgia, diabetes, and bursitis, claiming that they supported Plaintiff's ability to "frequently climb ramps[,] stairs[,] . . . ladders, ropes, or scaffolds" and to "frequently stoop, kneel, crouch, and crawl." (*Id.*). The ALJ concluded that Plaintiff's language barrier limited him to "work that does not require English speaking." (*Id.* at 26, 31). Finally, the ALJ found Plaintiff's "severe and nonsevere impairments" supported a need to limit him from frequently working around hazards involving unprotected heights, moving mechanical parts, and the operation of motor vehicles. (*Id.*).

At step four, the ALJ found Plaintiff was "capable of performing past relevant work as an Industrial Cleaner." (Doc. 12–3 at 33).

At step five, the ALJ found Plaintiff could adjust to other work that exists in significant numbers in the national economy, in addition to being able to perform his past relevant work. (Doc. 12–3 at 33–34). The ALJ based this finding on a vocational expert's ("VE") testimony that a person of Plaintiff's age, education, work experience, and RFC

could perform the work of a linen room attendant, lamination assembler, and laundry worker. (*Id.* at 34). Accordingly, the ALJ found Plaintiff not disabled. (*Id.* at 34–35).

## II.  LEGAL STANDARD

The Court may not overturn the ALJ's denial of disability benefits absent legal error or a lack of substantial evidence. *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018). "Substantial evidence means . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). On review, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (citation omitted). The ALJ, not the Court, draws inferences, resolves conflicts in medical testimony, and determines credibility. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984). Thus, the Court must affirm even when "the evidence admits of more than one rational interpretation." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). But by the same token, the Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

## III.  ANALYSIS

Plaintiff argues that the ALJ erred both in partly discrediting Plaintiff's symptom testimony and in determining his work capacities at the medium exertional level. (Doc. 14 at 12, 20). Defendant contends that the ALJ articulated legally sufficient reasons supported by substantial evidence for both findings. (Doc. 16 at 3, 23–24). The Court takes each issue in turn.

### A. Whether the ALJ Properly Discredited Plaintiff's Symptom Testimony

Plaintiff argues that the ALJ improperly discounted Plaintiff's testimony regarding the severity of his symptoms by failing to provide specific, clear, and convincing reasons supported by substantial evidence. (Doc. 14 at 12). The ALJ found that Plaintiff's

"medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Doc. 12–3 at 28).

### i. Legal Standard

In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of his symptoms, the ALJ must engage in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). First, as a threshold matter, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if the claimant meets the first test, then "the ALJ 'may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.'" *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (quoting *Bunnell*, 947 F.2d at 346–47). Rather, "unless an ALJ makes a finding of malingering based on affirmative evidence thereof," the ALJ may only find the claimant not credible by making specific findings supported by the record that provide clear and convincing reasons to explain his credibility evaluation. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citing *Smolen v. Chater*, 80 F.3d 1273, 1283–84 (9th Cir. 1996)); *Lingenfelter*, 504 F.3d at 1036. An adverse credibility finding is sufficiently specific if the ALJ identifies "what testimony is not credible and what evidence undermines the claimant's complaints." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted).

In assessing credibility, the ALJ may consider, among other factors, "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily

activities." *Ghanim*, 763 F.3d at 1163 (citation omitted). If the ALJ relies on these factors, and his reliance is supported by substantial evidence, the Court "may not engage in second-guessing." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)).

      **ii.** **Analysis**

Here, the ALJ did not find that Plaintiff was malingering and concluded that his medically determinable impairments could reasonably be expected to produce some of his alleged symptoms. (Doc. 12–3 at 28). Because the ALJ did not find that Plaintiff was malingering, the Court must determine whether the ALJ gave specific, clear, and convincing reasons for partly discrediting his symptom testimony.

Plaintiff asserts that the ALJ improperly required him to provide medical evidence of his symptom severity when the ALJ concluded that Plaintiff's statements regarding the severity of his "symptoms are not entirely consistent with the medical evidence." (Docs. 12–3 at 28; 14 at 13–14). Although the Court agrees that Plaintiff is not required to provide medical evidence of the severity of his symptoms, *see Garrison*, 759 F.3d at 1014–15, objective medical evidence is a useful tool in assessing Plaintiff's credibility regarding the intensity and persistence of his symptoms. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (holding that objective medical evidence was appropriately used to assess credibility of Plaintiff's symptom testimony); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (holding that medical evidence is "a relevant factor in determining the severity of [Plaintiff's] pain and its disabling effects."). Moreover, apparent contradiction between Plaintiff's symptom testimony and the objective medical record may provide a valid reason for discounting Plaintiff's credibility. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

Plaintiff also argues that "the ALJ failed to tie-in the characterization of the medical record with any specific alleged inconsistency within [Plaintiff's] symptom testimony," when discounting Plaintiff's credibility. (Doc. 14 at 14). Yet, the ALJ's statement that

Plaintiff's impairments could reasonably be expected to cause only "some of the alleged symptoms" and that his symptom testimony was "not entirely consistent" with medical evidence merely notes that the record contains conflicting evidence. (Doc. 12–3 at 28). In fact, contrary to Plaintiff's assertion, the ALJ discussed Plaintiff's symptom testimony in detail, tying that discussion to specific portions of the record which he found to be conflicting, namely: (1) largely unremarkable imaging and exams with no clinical concerns recommending surgery or work limits; (2) isolated positive clinical findings which remained stable with no worsening symptoms; (3) Plaintiff's ability to manage chronic pain with no more than conservative care; and (4) Plaintiff's self-reported daily activities. (Doc. 12–3 at 32–33). Thus, the Court finds the ALJ sufficiently tied his characterization of the medical record to Plaintiff's symptom testimony by articulating specific inconsistencies, each of which the Court will consider in turn.

### a.  Largely Unremarkable Imaging and Exams

The ALJ found Plaintiff's credibility diminished due to inconsistencies between his allegations of pain regarding his diabetic neuropathy and objective medical evidence. (Doc. 12–3 at 29, 33). While Plaintiff indicated that his neuropathy testing had yielded good results around the time of the October 2020 hearing, he alleged, in July 2021, that his symptoms had worsened. (*Id.* at 28, 52, 56). Yet, the ALJ noted that Plaintiff "has consistently demonstrated no neurological deficits on his exams since May 4, 2018," the alleged onset date of disability. (*Id.* at 29). Moreover, the ALJ observed that EMG and nerve conduction testing done in 2017, 2018, and 2019 revealed "no peripheral neuropathy and only a mild peroneal proximal delay." (*Id.*).

Plaintiff further testified that his diabetes would cause blurry vision, making it difficult for him to drive and complete certain tasks. (*Id.* at 78, 81). While Plaintiff's optometrist, Dr. Franstsvog, found him to be disabled in December 2020, the ALJ argued that this conclusion was based on Plaintiff's subjective complaints at the time of the assessment, as there was no "diabetic retinopathy shown on exam." (*Id.* at 31). Thus, the ALJ cited to specific test results that revealed mild to unremarkable findings, which support

his assertion that the alleged severity of Plaintiff's symptoms is inconsistent with clinical evidence. The Court finds this inconsistency is a clear and convincing reason to discount Plaintiff's diabetic neuropathy testimony.

The ALJ also partly discredited Plaintiff's symptom testimony regarding bursitis due to largely unremarkable imaging. (Doc. 12–3 at 29, 33). Plaintiff testified that he was receiving injections to treat pain in his left hip, while participating in physical therapy. (Doc. 12–3 at 78). Yet, the ALJ noted that imaging of Plaintiff's hip and knees in July 2020 showed "normal joint spacing of the bilateral medial compartments of the knees and minimal narrowing bilaterally of the femoral acetabular hip joints." (*Id.* at 29). Additionally, because Plaintiff reported "improvement in his hip and leg pain, indicating only occasional symptoms," it was reasonable for the ALJ to doubt that Plaintiff's symptoms were as severe as alleged. (*Id.*). The Court finds that, by referencing Plaintiff's self-reported improvement and largely unremarkable imaging, the ALJ provided clear and convincing reasons to discount Plaintiff's bursitis symptom testimony.

Regarding Plaintiff's degenerative disc disease, the ALJ found that Plaintiff's symptom testimony was inconsistent with mild findings on spinal imaging. (Doc. 12–3 at 29). In October 2020, Plaintiff testified he had been participating in pain management for over two years to treat neck, arm, and leg pain, which increased with activity and made him tired. (Doc. 12–3 at 77). Plaintiff claimed that injections would provide relief only sometimes and that his pain limited his ability to walk, stand, or sit for more than ten to fifteen minutes. (*Id.* at 78–79). Plaintiff argues the ALJ erred in stating that Plaintiff's spinal imaging since 2011 showed only "mild degenerative changes," (*Id.* at 28), pointing out that imaging did, in fact, show "degeneration at the lumbar spine that touched the traversing nerve roots with moderate stenosis, and disc protrusion at the cervical spine that caused severe stenosis." (Doc. 14 at 15).

Yet, the ALJ acknowledged that Plaintiff's "reported worsening symptoms" since the October 2020 hearing were consistent with updated cervical imaging in September 2020, which revealed "a disc osteophyte complex causing severe narrowing and severe

range of motion deficits on exam, warranting physical therapy." (Doc. 12–3 at 28–29). The ALJ also addressed Plaintiff's lumbar spine imaging, which revealed a "disc protrusion at L4-L5 causing nerve root displacement shown since 2011, and a disc bulge at L5-S1 without nerve root compromise." (*Id.* at 29). The ALJ further noted that updated imaging "shows only mild to moderate L4-L5 degenerative disc space narrowing and a stable eccentric bulge to the right." (*Id.*). Contrary to Plaintiff's assertion, the ALJ thus acknowledged remarkable findings yet reasoned that, because they did not cause "clinical concerns warranting surgery or provider recommended limits at work," Plaintiff's symptoms were not as severe as alleged. (*Id.*). The ALJ pointed to a lack of clinical concern as a clear and convincing reason to partly discredit Plaintiff's symptom testimony regarding the severity of his back pain.

Plaintiff contends that the ALJ's interpretation of imaging as being inconsistent with Plaintiff's symptom testimony amounts to "nothing more than providing his own improper medical opinion," effectively usurping the role of a doctor. (Doc. 14 at 15–16). Yet, the ALJ used objective evidence in the record—namely, that even the remarkable findings were without clinical concerns leading to surgery recommendations or work restrictions—to evaluate Plaintiff's credibility. (Doc. 12–3 at 29). Plaintiff further argues that the lack of provider-recommended limits at work is not evidence that he had none and that the physician-recommended course of care, including "spinal injections, trigger point injections, nerve blocks, and nerve burning procedures," provides ample support for Plaintiff's symptom testimony. (Doc. 14 at 18–19). However, when examining the medical record, "[r]esolving conflicts is the ALJ's responsibility and prerogative." *Owen v. Saul*, 808 F. App'x 421, 423 (9th Cir. 2020). It is not for the Court to second guess the ALJ's reasonable interpretation of Plaintiff's imaging results because "where evidence is susceptible to more than one rational interpretation, as it is here, it is the ALJ's conclusion that must be upheld." *Benear v. Comm'r of Soc. Sec. Admin.*, No. CV-17-04160-PHX-JAT, 2019 WL 258345, at *6 (D. Ariz. Jan. 18, 2019), aff'd sub nom. *Benear v. Saul*, 838 F. App'x 305 (9th Cir. 2021) (cleaned up). Thus, even as a lay person, the ALJ properly

weighed the evidence before him and provided clear and convincing reasons for his determination.

### b. Isolated Positive Clinical Findings

The ALJ further discredited Plaintiff's symptom testimony because his conditions revealed "only isolated positive clinical findings," and he had "consistently demonstrated normal muscle strength, sensation and reflexes, muscle tone, [and] coordination and gait on exams despite his long history of degenerative lumbar disc disease." (Doc. 12–3 at 28–29). Plaintiff argues that "the ALJ failed to reconcile [Plaintiff's] presentation at time-limited appointments with [his] functioning over an eight-hour workday," especially since Plaintiff testified that his pain increased with activity. (Doc. 14 at 14). Moreover, Plaintiff disputes that normal physical exam findings are inconsistent with such reports of pain. (*Id.*). Plaintiff further contends that the ALJ "failed to reconcile any normal findings with the other observed positive objective findings that supported and were consistent with [his] symptom testimony" including "tenderness to palpation at the sine and facet joints, positive facet loading maneuvers, slow and limited spinal motion, decreased lower extremity sensation, positive straight leg test, and positive Spurling's test." (Doc. 17 at 6).

Yet, the ALJ examined the medical record as a whole, including portions of the record that supported his findings and portions that did not. (*See, e.g.*, Doc. 12–3 at 28 (citing portions of the record referencing Plaintiff's routine demonstration of "good motor function, good range of motion and intact motor strength, sensations, reflexes, coordination and gait patterns" followed by portions of the record showing Plaintiff's "pain with facet loading or straight leg raise testing.")). The ALJ indicated that, in 2019, Plaintiff's "degenerative changes at L4-L5 and L5-S1 remain[ed] stable without significant progression in disease, with mild foraminal stenosis at L4-L5, a small protrusion at L5-S1 and moderate facet arthropathy at C7-T1, but [without] clinical concerns on physical exam for his motor or neurological function." (*Id.* at 29). The ALJ thus addressed the apparent discrepancy between findings, noting that the positive findings were isolated and "without clinical concerns suggesting worsening symptoms" since May of 2018. (*Id.* at 29). The

Court finds the ALJ did not engage in "cherry-pick[ing] normal examination findings," (Doc. 17 at 6), since the medical record as a whole is at least ambiguous as to Plaintiff's symptoms. Furthermore, "given that the ALJ is the 'final arbiter with respect to resolving ambiguities in the medical evidence,'" the Court defers to the ALJ's findings of stability and lack of clinical concern regarding worsening symptoms as clear and convincing reasons for discounting Plaintiff's testimony. *Singh v. Comm'r of Soc. Sec. Admin.*, No. CV-19-02315-PHX-MTM, 2020 WL 5757620, at *3 (D. Ariz. Sept. 28, 2020) (quoting *Tommasetti*, 533 F.3d at 1041).

### c. Ability to Manage Chronic Pain with Conservative Care

The ALJ further discounted the severity of Plaintiff's symptoms because Plaintiff reported "improvement with injection therapy" and had an "extremely positive response" to what the ALJ considered to be "no more than conservative care." (Doc. 12–3 at 27, 29, 31). The ALJ observed that since 2016, Plaintiff has "indicated his pain symptoms are well controlled and 85% improved with injection therapy, even while working through 2019." (*Id.* at 29–30). The ALJ reasoned that Plaintiff's symptoms were not as severe as alleged, crediting Plaintiff's own report that "he has only occasional and minimal pain in 2021." (*Id.* at 30). Plaintiff contends that although he candidly reported improvement, the record demonstrates that "with improvement in one part of the spine, came pain at other locations that then had to be treated, and then prior pain that had improved would return." (Doc. 14 at 18). Plaintiff claims he reported "increased pain after the onset of disability, and additional invasive pain management procedures were ordered and performed due to 'worsening' symptoms." (*Id.* at 17). Accordingly, Plaintiff argues that the ALJ erred in suggesting his symptoms and "chronic pain had remained stable or improved since 2016 (prior to his onset date of disability)" and noted that even a stable condition can be disabling. (*Id.*).

While Plaintiff is correct that some improvements and stability in medical conditions do not mean that a party is symptom free, *see Petty v. Astrue*, 550 F. Supp. 2d 1089, 1099 (D. Ariz. 2008), the self-reported improvements in Plaintiff's symptoms as

being "well controlled" constitute clear and convincing reasons supporting the ALJ's ultimate decision to partially discredit his testimony.[2] (Doc. 12–3 at 29). Because the ALJ highlighted specific portions of the record indicating improvement, the Court finds that the ALJ did not err in discounting Plaintiff's symptom testimony on this basis. *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (holding that evidence of effective treatment is sufficient to discount Plaintiff's testimony regarding symptom severity)); *see also Singh*, 2020 WL 5757620, at *2–3 (affirming the ALJ's discounting of Plaintiff's testimony, in part, because Plaintiff's conditions improved with treatment).

Moreover, Plaintiff's assertions regarding both improved and worsening pain indicate the evidence is at least ambiguous as to whether Plaintiff's testimony is supported by his treatment record. Again, because "the ALJ is the 'final arbiter with respect to resolving ambiguities in the medical evidence,'" the Court defers to the ALJ's finding. *Singh*, 2020 WL 5757620, at *3 (quoting *Tommasetti*, 533 F.3d at 1041).

### d. Daily Activities

The ALJ found that Plaintiff's activities of daily living contradicted the level of impairment he claimed. (Doc. 12–3 at 23, 28, 32). Plaintiff testified that he had pain, fatigue, and vision deficits which restricted him from driving long distances and required him to take resting breaks or sit in a chair when completing chores. (*Id.* at 79–81). Yet, as the ALJ noted, Plaintiff indicated he was able to ride a bike and bowl with "only moderate limits" and denied "limits in his ability to perform daily activities." (*Id.* at 28). The ALJ also acknowledged Plaintiff's daily activities, as he reported them in a September 2018

---

[2] While Plaintiff disputes that his care qualifies as conservative, the Court need not decide whether the ALJ properly classified the treatment as such. Because the ALJ gave other clear and convincing reasons—namely, that Plaintiff's condition remained relatively stable and that treatment was effective—the Court finds the ALJ properly discredited the symptom testimony. *See Carmickle*, 533 F.3d at 1162 (recognizing harmless error where "two of the ALJ's [four] reasons supporting his adverse credibility finding [were] invalid.").

disability function report: driving a cab from 5:00 a.m. to 5:00 p.m., preparing meals, going out five days per week, doing laundry, ironing, performing home repairs, shopping in stores, and lifting 20 pounds. (*Id.* at 28) (cleaned up). The ALJ further credited Plaintiff's report that his pain remained "well controlled" in 2021 and noted that he did not appear to need a cane to walk or have "any physical limits from his neck, back, hip, knees, shoulders or hands," other than those established in the ALJ's decision. (*Id.* at 29). Moreover, because Plaintiff only reported "increasing back pain over three days . . . after lifting and moving a washing machine," the ALJ found his physical limits to be less severe than alleged. (*Id.*).

The Ninth Circuit has long held it appropriate to consider a claimant's engagement in daily activities as a factor in assessing his credibility. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). While a claimant need not "vegetate in a dark room" to be eligible for benefits, *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (quotation omitted), daily activities undertaken by the claimant "may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment," even when those activities suggest some difficulty functioning. *Molina*, 674 F.3d at 1113 (citing *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010)). Thus, the Court finds that even though Plaintiff stated that he had difficulty functioning, the ALJ properly discounted his credibility to the extent that his daily activities were inconsistent with an inability to work in any capacity. *See, e.g.*, *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990) (finding that the claimant's ability to "take care of [his] personal needs, prepare easy meals, do light housework and shop for some groceries . . . may be seen as inconsistent with the presence of a condition which would preclude all work activity." (citations omitted)); *Molina*, 674 F.3d at 1113 ("[An] ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[,] [e]ven where those activities suggest some difficulty functioning . . . " (citations omitted)).

Plaintiff contends, however, that his capacities are not transferable to a work setting, as there are critical differences between daily activities and activities required by a full-

time job, which the ALJ neglected to distinguish. (Doc. 14 at 16). However, "the ALJ is not required to show that a claimant's activities are transferable to the work setting in order to discount [his] testimony on their account. Rather, an ALJ may consider whether a claimant engages in daily activities that are simply inconsistent with [his] allegations or that suggest that they are exaggerated, irrespective of whether the activities are transferable to a work setting." *Handy v. Comm'r of Soc. Sec. Admin.*, No. CV-19-04545-PHX-JZB, 2020 WL 5699001, at *4 (D. Ariz. Sept. 24, 2020) (citing *Molina*, 674 F.3d at 1112).

Plaintiff also asserts that the ALJ's mere "list of activities, without any information as to the demands, frequency, or duration of those activities, does not show any contradiction with [Plaintiff's] reported symptoms." (Doc. 14 at 17). Plaintiff contends that, ultimately, the ALJ did not find that a substantial part of a typical day was spent engaged in activities inconsistent with Plaintiff's claimed limitations. (*Id.* at 16). Yet, even if the evidence is not clear on how long or often Plaintiff performed his daily activities, the Court declines to second-guess the ALJ's reasonable determination to the contrary, despite the possibility that the evidence could give rise to inferences more favorable to Plaintiff. *See Rollins*, 261 F.3d at 857 (holding that, even when the record was equivocal about how long and often Plaintiff engaged in daily activities, the court would not second-guess the ALJ's interpretation as long as it was reasonable).

Here, the ALJ reached a reasonable determination based on substantial evidence that Plaintiff's daily activities were incompatible with the severity of his alleged symptoms. Accordingly, Plaintiff's daily activities are a clear and convincing reason to discount his symptom testimony. *See Ghanim*, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."). In sum, the Court finds the ALJ provided clear and convincing reasons supported by substantial evidence for finding Plaintiff's symptom testimony less than fully credible.

**B. Whether the ALJ Properly Determined Plaintiff's RFC**

Plaintiff argues that the ALJ improperly relied on the State agency experts' opinions in finding that Plaintiff could perform work at the medium exertional level and that the ALJ's "determination of [Plaintiff's] work capacities was unsupported by the evidence in [the] record." (Doc. 14 at 20–21). The ALJ based his findings on the objective medical record, as discussed above, and Plaintiff's daily activities. (Doc 12–3 at 31–33). The ALJ further noted that the agency's reviewers' opinions support his findings, "without contrary evidence or well-supported opinion shown in the record." (*Id.* at 33).

### i. Legal Standard

The March 2017 changes to the Social Security regulations "clarified that all medical sources, not just acceptable medical sources, can provide evidence that will be considered medical opinions." *David D. v. Saul*, 405 F. Supp. 3d 868, 886 n.4. Under these new regulations, medical source opinions are evaluated using the factors identified in 20 C.F.R. § 404.1520c. The ALJ must consider and explain how well the medical evidence supports the medical opinion and how consistent the medical opinion is with the record, and may, but is not required to, explain how the other factors under § 404.1520c(c)(3)–(5) are considered. 20 C.F.R. § 404.1520c(b)(2)–(3); *see also David D.*, 405 F. Supp. 3d at 886 n.4.

To conclude the ALJ made a materially harmful error, the Court must find that the ALJ's reliance on the agency's nonexamining and examining reviewers' opinions is not supported by and is inconsistent with the medical evidence on record. The Court finds no materially harmful error.

### ii. Analysis

The opinions of State agency nonexamining physicians, Dr. Mallik and Dr. Subin, are both supported by and consistent with medical evidence, comporting with the standard set forth in 20 C.F.R. § 404.1520c. (Doc. 12–3 at 31–32). Based on their review of the medical record, both doctors opined that Plaintiff "retained the ability to perform medium work with frequent postural limits." (*Id.* at 32). Plaintiff argues that because the doctors

did not review records after August 2019, they "were not apprised of over two years of pain management records which showed" Plaintiff's worsening condition. (Doc. 14 at 21). Yet, the ALJ noted that the doctors' findings regarding Plaintiff's work capacity were "consistent with the updated medical record, including updated imaging, nerve testing, physical exams, physical therapy and [Plaintiff's] self-reported daily activities." (Doc. 12–3 at 32). The ALJ determined that these findings were not only consistent with, but also supported by the record in that each doctor "provided specific references to the medical record to support their findings." (*Id.*). These references included Plaintiff's "stable cervical and lumbar imaging, his good response to medial branch blocks and injection therapy, his lack of neuropathy or radiculopathy on EMG testing, his ability to manage his symptoms with conservative care and his self-reported daily activities." (*Id.*).

Substantial evidence also supports the ALJ's decision to rely on the opinion of State agency examining physician, Dr. Gordon, who found Plaintiff "retained the ability to perform medium work." (Doc. 12–3 at 31). Plaintiff argues the ALJ erred in relying on Dr. Gordon's findings since the ALJ failed to provide him with any of Plaintiff's background medical records prior to examination. (Doc. 14 at 21). Yet, even without Plaintiff's prior record, Dr. Gordon's findings proved to be consistent with and supported by the objective medical record. (Doc. 12–3 at 31). After performing a clinical exam, Dr. Gordon "found no atrophy, vision deficits, or difficulty in performing orthopedic maneuvers, and normal gait, balance, affect, speech, and thought patterns," despite Plaintiff having a positive Spurling's, Phalen's, and Tinel's test and decreased range of motion of the cervical spine. (*Id.* at 30) (cleaned up). The ALJ noted that such exam findings were consistent with Plaintiff's "remarkably stable imaging, unremarkable physical and mental exams, ability to manage his symptoms with no more than conservative care, his good response to injection therapy and evidence showing he is lifting a washing machine not long after Dr. Gordon's exam." (*Id.* at 31). The ALJ also remarked that Dr. Gordon's recommended work limits were "consistent with his own exam showing [Plaintiff's] normal motor strength, muscle tone, reflex, and sensation, and good range of motion overall." (*Id.*).

The ALJ noted that Dr. Gordon's opinion was also supported by the medical record, namely, Plaintiff's own pain management account. (Doc. 12–3 at 30). While Plaintiff reported to Dr. Gordon on exam "significant limits in his daily activities" and that his pain medications helped only "minimally," this was contrary to his contemporaneous pain management reports of only "occasional and minimal pain" in 2021. (*Id.*).

The ALJ further explained that he found the State agency experts' findings to be persuasive "because they are specialists and familiar with program rules." (Doc. 12–3 at 31–32). Although the ALJ credited the experts' finding of medium work capacity, he included "additional physical limits to account for" both severe and nonsevere impairments, deviating from the nonexamining reviewers' finding that Plaintiff had "no reaching, manipulative, communicative, or environmental limits." (*Id.* at 32) (cleaned up). Dr. Gordon's recommended work limits, which the ALJ found persuasive, were consistent with this deviation. (*See id.* at 31).

Here, the ALJ properly applied the factors that ALJs must consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings, specifically noting both supportability and consistency of each medical source's testimony. (*See* Doc. 12–3 at 30–33); 20 C.F.R. § 404.1520c(c). Accordingly, the Court concludes the ALJ did not err in relying on the State agency experts' opinions to support his finding of Plaintiff's work capacity at the medium exertional level. The Court also finds the ALJ appropriately supported his determination of Plaintiff's work capacities with substantial evidence, including the objective medical record and Plaintiff's daily activities, as discussed above.

**IV.    CONCLUSION**

For the foregoing reasons,

/ / /

/ / /

/ / /

/ / /

**IT IS ORDERED** that the ALJ's decision is **AFFIRMED**. The Clerk of the Court shall enter judgment accordingly.

Dated this 27th day of July, 2023.

*James A. Teilborg*
Senior United States District Judge